IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:18-CR-00263** |
| | : | |
| **v.** | : | |
| | : | |
| **DAMON TODD CAREY** | : | **Judge Sylvia H. Rambo** |

**M E M O R A N D U M**

Before the court are Defendant Damon Todd Carey's motions for judgment of acquittal and new trial. For the reasons set forth below, the motions will be denied.

## I.     BACKGROUND

On March 31, 2021, the government charged Carey in a four-count superseding indictment with the following crimes: (1) possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a); (2) possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a); (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (4) conspiracy to possess with intent to distribute marijuana and 500 grams or more of cocaine, in violation of 21 U.S.C. § 846. (*See* Doc. 178.) On April 22, 2021, after a four-day trial, the jury found Carey guilty on all counts. (*See* Docs. 226-227.) Carey subsequently filed motions for judgment of acquittal and

new trial and thereafter amended the motions several times. (Docs. 236-242, 244-245, 248, 273-274.) The motions have been fully briefed and are ripe for review.[1]

At trial, the jury heard testimony by U.S. Marshal Gary Duncan. Duncan testified that on April 6, 2018, he and his team conducted surveillance outside Carey's residence as they prepared to execute a federal arrest warrant on him. (Doc. 253 at 25:16-18.) While conducting surveillance, Duncan observed Carey exit the residence and walk towards a white sedan with a bag in his hand. (*Id.* at 25:23-28:3.) Carey got into the car and pulled it closer to the residence, which he then reentered. (*Id*. at 28:3-6.) After positively identifying Carey, Duncan called additional members of his team to the residence in order to effectuate Carey's arrest. While the additional team members were in route, Carey again exited the residence, got into the car, and began to drive away from the house. (*Id*. at 29:6-14.) Duncan pulled out to the road with his undercover vehicle, which was approximately 75 yards from the residence, and activated his emergency lights and sirens. (*Id*. at 29:21-30:15.) As the two vehicles drove towards each other, Carey attempted to swerve around Duncan's vehicle, but he hit a parked car and came to a stop. (*Id*. at 30:16-24.)

Duncan then arrested Carey and conducted a sweep of the vehicle to ensure there were no other occupants inside. (*Id.* at 33:2-34:7). In the trunk of the vehicle,

---

[1] After filing the motions and supplemental motions, Carey's attorney moved, at the direction of Carey, to withdraw as counsel. The court granted the motion, and Carey thereafter filed *pro se* supplemental motions. (Docs. 251-252.)

Duncan located the bag he saw Carey carrying. The bag was on its side and was holding a shoebox, and Duncan observed through the thumb hole of the shoebox what he believed to be cash. (*Id*. at 34:7-19.) Duncan and his team contacted the Harrisburg City police, who responded to the scene and eventually opened the shoebox, which revealed a large quantity of cash. (*Id.* at 35:10-37:15.)

The jury also heard testimony from Detective Jason Paul, a member of the Harrisburg City Police Department assigned to the vice unit. (Doc. 258 at 3:13-19.) Paul testified that on April 6, 2018, he responded to Carey's residence to assist the U.S. Marshals. (*Id*. at 4:12-15.) After Duncan explained what had occurred, Paul observed the shoe box that was found in Carey's trunk. He saw an unspecified amount of currency through the hole and opened the box, revealing what was later determined to be approximately $80,000 in cash. (*Id.* at 5:4-19, 7:16-24.) Paul entered Carey's residence to speak with his girlfriend, Mikia Slone. He asked Slone whether there was anything illegal in the house, and Slone replied that a gun she legally owned was upstairs, but she did not know its make or model. (*Id*. at 8:20-9:3.) After Slone refused to consent to a search of the residence, Paul obtained a search warrant and returned to the property. (*Id*. at 8:20-9:3, 12:15-20.)

Paul testified that he and other officers recovered several pieces of evidence from the residence, including large amounts of cocaine and marijuana (*id*. at 13:9-14); a 9-millimeter handgun (*id*. at 19:8-15); a 9-millimeter magazine located in the

bedroom on the bed, and five bullets of 9-millimeter ammunition (*id*. at 19:20-20:12); a handgun holster (*id.* at 18:23-25); four rounds of 45-caliber ammunition (*id*. 19:1-4); five cell phones (*id.* at 17:24-18:1); a money counter; a kilo-press partially covered in white powder that tested presumptively positive for cocaine; cooking items that were partially covered in white powder that tested presumptively positive for cocaine, including a Kitchen-Aid mixer and two measuring cups (*id.* at 34:11-36:2, 53:16-20); three scales partially covered in a substance that tested presumptively positive for cocaine, one of which was capable of measuring up to 15,000 grams (*id*. at 36:4-37:8); a bag of mannitol pure powder and four bottles of benzocaine hydrochloride, located in the same bags as the cooking supplies (*id.* at 38:12-17); and pure baking soda, which is commonly mixed with cocaine in order to cook it into crack cocaine (*id.* at 26:4-11). In addition, the officers recovered numerous Ziploc bags of various sizes, including a 150-count box of sandwich bags that are commonly used by street-level drug traffickers for holding drugs, smaller baggies with various decals that are commonly used for packaging marijuana and cocaine, and larger bags located in the same duffel bag as the cooking supplies. (*See id*. at 11:24, 24:17-27:17).

The jury also heard testimony from Amber Gegg, a forensic scientist and drug identification analyst with the Commonwealth of Pennsylvania. (Doc. 258 at 98:16-18.) Gegg testified that she tested and weighed the substances recovered from

4

Carey's home and found them to contain controlled substances. Specifically, she concluded that 310 grams of white powder seized from Carey's residence contained cocaine (*id.* at 108:14-17, 111:23-112:23, 114:1-7), 2209 grams of vegetable matter contained marijuana (*id*. at 114:11-14, 115:13-116:4), 65 grams of clear liquid contained cannabinoid MMB-Fubinaca, a synthetic cannabinoid (*id.* at 116:11-117:1), and 3 grams of clear liquid contained phencyclidine (PCP) and MMB-Fubinaca (*id*. at 117:16-25).

Slone also testified at trial. Slone testified that she dated and lived with Carey from around August or September 2017 until November 2017. (*Id.* at 141:18-143:25.) Slone then moved to her sister's house and dated only Carey sporadically, until around April 2018 when she moved into Carey's residence with him. (*Id.* at 141:18-143:25; Doc. 257 at 5:19-25.)

Slone testified that Carey sold cocaine and marijuana. (Doc. 258 at 145:4-11.) She testified that Carey kept the drugs at his residence and another home and sometimes drove different cars in order to be less noticeable to others. (Doc. 257 at 61:1-13; Doc. 258 at 155:7-156:25.) According to Slone, Carey purchased cocaine from an individual who lived in Philadelphia, and transactions frequently took place at the outlet malls in Lancaster. Carey received the cocaine in tape-wrapped flat cardboard packages. (Doc. 258 at 145:4-11, 147:2-148:3.) Slone estimated that she traveled with Carey to meet the individual in Philadelphia on two occasions, and in

Lancaster on at least four occasions. (*Id.* at 145:22-146:23, 149:21-23; Doc. 257 at 21:10-16.) She did not specify the dates of the Philadelphia trips, and she could not remember the dates of the Lancaster trips. (Doc. 257 at 29:17-20.)

According to Slone, Carey sometimes traveled to Lancaster with other people instead of her. (*Id*. at 27:5-6.) Slone testified that at the time of Carey's car crash and arrest, he was on his way to Lancaster to purchase additional cocaine or settle a prior cocaine debt, and the money in his possession was derived from drug sales. (*Id*. at 27:7-12; Doc. 258 at 157:1-24.) When Slone heard or saw the crash, she took as many drugs as she could from Carey's residence and flushed them down the toilet, including a baby bottle of liquid PCP and two lemon- or lime-sized bags of cocaine. (Doc. 258 at 173:17-174:12.)

Slone testified that various people owed Carey money for cocaine. She identified a document with names and monetary amounts that was recovered from the residence as Carey's "owe sheet," which she observed Carey use to keep track of the money he was owed from drug sales. (*Id.* at 162:12-14, 169:16-20, 171:1-14.) After Carey was arrested, he spoke with Slone about helping to recover certain debts, including debts owed by at least three individuals whose names or initials appear on the owe sheet. (*Id.* at 60:22-25, 171:15-172:2, 176:3-177:9, 182:1-183:13.)

In addition, Slone testified that she observed Carey cooking cocaine in the kitchen on one occasion. (*Id.* at 166:7-168:10.) She did not specify when she made

the observation, other than to say that it did not take place in Carey's residence that she moved into in April 2018. (Doc. 257 at 14:22-15:1.) Slone believed that Carey cooked cocaine approximately every two weeks, but she explained that she usually stayed out of the kitchen because Carey did not like others in the room. (Doc. 258 at 167:15-168:10.) According to Slone, Carey cut his cocaine with Benzocaine before selling it. (*Id.* at 162:15-22.) Carey used Slone's Amazon account twice to purchase a total of eight bottles of Benzocaine, and on one occasion the two visited a GNC store to look for the substance. (*Id.* at 163:1-64:25.)

Slone testified that she used Carey's money to purchase the handgun and ammunition that police found in the residence. (*Id.* at 150:7-14, 151:15-152:1; Doc. 257 at 63:15-19.) According to Slone, Carey had thought she should have a gun, and she too wanted one for personal protection. (Doc. 257 at 35:15-36:5.) Slone testified that she and Carey slept with the firearm on the nightstand, and she explained it was recovered from the bed because they "had just woken up, so it was just there from, like, going to sleep. It was always out." (*Id.* at 34:22-23.) Slone testified that she believed the gun had been loaded by Carey because she did not know how to load it herself and because nobody else touched or held the gun. (Doc. 258 at 152:18-153:11, 171:15-181:3.) Slone testified that Carey frequently told her to have her gun on her, including when they traveled to Lancaster together. (*Id.* at 149:13-150:6, 154:19-155:2; Doc. 257 at 44:12-23.)

The jury also heard testimony from Trooper Shawn Wolfe, a member of the Pennsylvania State Police assigned to its narcotics unit and an expert investigator of drug trafficking. (Doc. 257 at 70:5-8.) Wolfe testified that the large quantity of marijuana found in Carey's residence strongly supported that he intended to distribute or resell it, as marijuana users do not purchase five pounds of marijuana at a time. (*Id.* at 123:2-124:16.) He also testified that the bags seized were unlikely to be hemp because drug traffickers do not typically use or distribute hemp, and because a drug dealer would likely face retribution if they tried to portray hemp as marijuana. (*Id.*)

Wolfe similarly testified that the large quantities of cocaine found in Carey's home supported his intent to distribute the substance, as did various other items recovered from the residence, including multiple kitchen grinders that tested presumptively positive for cocaine residue and which are used by drug traffickers to mix together cocaine and cutting agents (*id*. at 111:2-112:12); benzocaine and mannitol, which are utilized by cocaine traffickers as cutting agents (*id*. at 84:1-25, 118:14-120:2); multiple strainers or sifters, which are used by drug traffickers to remove visible impurities from cocaine after it is mixed with a cutting agent (*id.* at 112:13-25, 113:1-114:9); a press that is capable of holding approximately 125 grams of cocaine, that tested presumptively positive for cocaine, and the type of which is frequently used by drug traffickers to compress large quantities of cocaine (*id.* at

109:19-111:1); baking soda, which is utilized by drug traffickers to "cook" powder cocaine into cocaine base (*id*. at 105:1-106:2); two-pound and four-pound glass measuring cups caked with what appeared to be cocaine base (*id.* at 107:11-109:18).

With respect to the mannitol that was recovered, Wolfe testified that 400 grams were missing from its 1000-gram bag and that, in his experience, a drug trafficker would use no more than 1 gram of mannitol for every gram of cocaine. (*Id*. at 126:11-127:11.) He also testified that a lemon- or lime-sized bag of cocaine, such as those that were flushed down the toilet by Slone, would weigh approximately 50-56 grams in powder form and up to 100 grams in compressed form. (*Id.* at 122:9-123:3.)

Wolfe further testified that various pieces of evidence indicated that Carey trafficked cocaine and marijuana on a large scale. For example, Wolfe testified that money counters and digital scales, such as those that were recovered from Carey's residence, are more likely to be used by high-level drug traffickers. (*Id.* at 114:10-117:8, 120:3-121:1.) He also opined that the document seized from Carey's residence listing individuals and monetary denominations appeared to be an "owe sheet." According to Wolfe, it is not abnormal for drug traffickers to "front" large amounts of drugs to others on credit, and then make a record of the money that is owed to them. (*Id.* at 97:19-98:12.) Wolfe noted that the owe sheet showed more than $70,000 in total outstanding debt and included individual entries of up to

$18,500, which indicated to him that it was used to keep track of money that was owed from the sale of cocaine. (*Id.* at 98:22-100:4, 156:12-20.) Wolfe estimated that one kilogram of cocaine cost approximately $40,000 at the time of Carey's arrest, and he testified that the large denominations reflected on the owe sheet, as well as the $80,000 that was seized from Carey's vehicle, suggested that Carey was an upper-tier, large-scale drug trafficker. (*Id.* at 156:21-157:7.) In addition, Wolfe testified that the risk of violence increases as one moves up the drug-distribution ladder, and as such, drug traffickers frequently keep firearms, such as the one that was recovered from Carey's home, to protect their product, their money, or their own personal safety. (*Id.* at 100:5-25.)

Finally, the jury heard testimony by U.S. Probation Officer Michael R. Yasenchak. (*Id.* at 162:17-20.) Yasenchak testified that while Carey was under supervision in 2017 and 2018, he reported self-employment as a personal trainer and at one point expressed his intent to drive for Uber. (*Id*. at 163:16-20.) Yasenchak testified that during that time, Carey's highest reported monthly gross income was $1,800. (*Id*. at 164:12-17.) Yasenchak further testified that Carey was not permitted to possess a firearm or ammunition in 2017 and 2018, and that he discussed the prohibition with Carey. (*Id.* at 165:14-22.)

## II.   <u>**STANDARD OF REVIEW**</u>

Under Rule 29 of the Federal Rules of Criminal Procedure, the court must grant a motion for judgment on acquittal on any offense for which the evidence is insufficient to sustain a conviction. The central question in deciding a motion for acquittal is whether, "viewing all the evidence adduced at trial in the light most favorable to the government, a rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Harmon*, 681 F. App'x 152, 155 (3d Cir. 2017) (citing *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993)). "A defendant challenging the sufficiency of the evidence pursuant to Rule 29 bears a heavy burden." *United States v. John-Baptiste*, 747 F.3d 186, 201 (3d Cir. 2014) (quoting *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992)). "The decision to overturn a conviction based on insufficient evidence may only be made where the prosecution's failure is clear, or where the verdict falls below the threshold of bare rationality." *United States v. Delgado*, 367 F. Supp. 3d 286, 291 (M.D. Pa. 2019) (internal quotation marks and citations omitted). "Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges." *United States v. Garner*, 915 F.3d 167, 169 (3d Cir. 2019) (quoting *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25 (3d Cir. 2013)).

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). "However, even if the court believes that the verdict is contrary to the weight of the evidence it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred— that is, that an innocent person has been convicted.'" *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir. 2008) (quoting *Johnson*, 302 F.3d at 150). A new trial should only be granted sparingly and in exceptional situations. *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003). Exceptional situations include those in which trial errors, "either individually or in combination, 'so infected the jury's deliberations that they had a substantial influence on the outcome of the trial.'" *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993); *United States v. Amirnazmi*, 648 F. Supp. 2d 718, 719-20 (E.D. Pa. 2009).

III.   **DISCUSSION**

    **a. The jury heard sufficient evidence from which it could conclude beyond a reasonable doubt that the substance recovered from Carey's residence was marijuana.**

Carey's motions contend that the government failed to prove that the bags of vegetable matter recovered from Carey's residence were actually marijuana and not hemp or CBD products, which are carved out from the Federal Controlled Substances Act. Under the statute, hemp is defined as any part of the cannabis Sativa L. plant or its derivatives that contain a delta-9 tetrahydrocannabinol ("THC") concentration of not more than 0.3 percent. *See* 21 U.S.C. § 802 (16)(B)(i). Carey contends that the government failed to prove that the bags contained marijuana because marijuana and hemp are visibly identical, and because the government's laboratory expert testified that she never tested the substance for THC.

Despite Carey's arguments, the jury heard sufficient testimony from which it could conclude beyond a reasonable doubt that substance recovered was marijuana. Slone testified, without any meaningful rebuttal, that Carey trafficked in marijuana and that the substance in question was in fact marijuana. Further, the government's drug trafficking expert testified that individuals involved in trafficking at the scale indicated by the evidence seized from Carey's residence deal in cocaine and marijuana, not cocaine and hemp. This evidence, combined with the laboratory scientist's testimony that the substance tested positive for marijuana but was not

tested for THC concentration, was sufficient to prove beyond a reasonable doubt that it was, in fact, marijuana. *See Griffin v. Spratt*, 969 F.2d 16, 22 n.2 (3d Cir. 1992) (noting that drug identity may be established through cumulative evidence, even in the absence of scientific evidence); *United States v. Stewart*, 179 Fed. App'x 814, 818 (3d Cir. 2006) ("It is well established that lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction.").[2]

---

[2] Carey's motions make two additional arguments that the court improperly excluded evidence. Neither has merit.

First, the motions assert that the court erroneously excluded photographs purporting to depict powdered Fubinaca and PCP. At trial, Slone testified that she observed Carey cooking cocaine in 2017, and the defense sought to introduce the photographs during its cross-examination of Slone and the laboratory expert in order to present an argument to the jury that the substance Slone observed may have been Fubinaca or PCP in powder form, rather than cocaine. Exclusion was nevertheless proper because, as the government correctly points out, the photographs were not authenticated. It was unclear where the photographs came from and what substances they actually depicted, and the defense did not and could not establish any foundation for their introduction. Additionally, even if it was error to exclude the photographs, Carey has not shown that the error had a substantial influence on the outcome of the trial. Regardless of whether Slone saw Carey cook cocaine or some other substance in 2017, the government introduced substantial additional evidence—including numerous cooking supplies that were caked with a substance that tested presumptively positive for cocaine—to support that Carey did in fact have a history of cooking cocaine. Exclusion of the photographs therefore does not warrant a new trial.

Second, Carey's motions argue that the cross-examination of the government's laboratory expert on the issue of marijuana and hemp was improperly limited. The defense was only prevented from questioning the expert about changes to state marijuana laws, however, a line of questioning that had little or no probative value and only would have served to confuse the jury. To the extent the defense sought to elicit testimony that the laboratory expert did not test the substance for THC and

### b. The jury heard sufficient evidence from which it could conclude beyond a reasonable doubt that Carey possessed with intent to distribute 500 or more grams of cocaine on or around April 6, 2018.

Carey's motions also argue that Carey is entitled to acquittal on Count IV to the extent the jury found that he possessed 500 grams or more of cocaine. The defense avers that the government failed to show that Carey possessed 500 grams or more of cocaine at one time on or around April 6, 2018 because the government only seized and tested a lesser quantity.

Carey's arguments are unpersuasive, as the jury heard sufficient direct and circumstantial evidence from which it could find beyond a reasonable doubt that Carey possessed 500 grams or more cocaine on or around April 6, 2018. The evidence at trial showed that on the day in question, 310 grams of cocaine were recovered from Carey's residence, and two additional lemon- or lime-sized bags of cocaine were flushed down the toilet. According to the government's expert witness, one bag of cocaine that size would weigh 50-56 grams in powder form and up to 100 grams in compressed form.

In addition, the jury heard testimony from Slone that at the time of Carey's arrest, he was traveling to Lancaster with approximately $80,000 in cash to pay for cocaine he previously acquired or to purchase additional cocaine. Slone testified that

---

therefore did not differentiate between marijuana and hemp, it did so. (*See* Doc. 258 at 132:19-22; Doc. 257 at 124:4-6.) The court's ruling does not require a new trial.

money was derived from drug trafficking, and the record demonstrated that Carey had no legitimate source for such a large sum of money. According to the government's drug trafficking expert, $80,000 would equate to approximately 2,500 grams of cocaine at wholesale prices, and it is not uncommon for drug traffickers to "front" cocaine on credit to another trafficker, who would then sell the cocaine and repay the debt with the money derived from the sales.

The government's expert further testified that an individual operating at the scale of Carey—based on the extensive quantities of drugs, cash, and drug trafficking paraphernalia recovered from his vehicle and residence—would be operating well in excess of 500 grams at one time. The expert's opinion was corroborated by Slone's testimony that in the period leading up to April 6, 2018, Carey traveled to Lancaster to purchase cocaine approximately every two weeks and was observed possessing up to five 220-250-gram cardboard packages of cocaine at one time. It was further supported by Carey's owe sheet reflecting tens of thousands of dollars in drug sales, as well as a recorded telephone call in which Carey told Slone that the 250-gram cardboard cocaine package recovered by law enforcement was "not really too much….That's not really a lot…It's the other shit that I'm worried about." (Doc. 246 at 6.) From this evidence, circumstantial as it may be, a reasonable jury could have concluded beyond a reasonable doubt that on or around the date of his arrest, Carey possessed with the intent to distribute 500 grams or more

of cocaine at one time.[3] *See Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982) ("The verdict may be based in whole or in part on circumstantial evidence.").

     **c.**  **The jury heard sufficient evidence from which it could conclude beyond a reasonable doubt that Carey possessed a firearm in furtherance of a drug trafficking crime on or around April 6, 2018.**

Carey's motion for acquittal also argues that he should be acquitted on Count III because the government did not show at trial that he possessed the firearm on around April 6, 2018 in furtherance of a drug trafficking crime. The Third Circuit in *Sparrow* set forth relevant factors to consider when determining whether the possession of a firearm advances or helps forward a drug trafficking crime, which include (1) the type of drug activity that is being conducted, (2) the accessibility of the firearm, (3) the type of the weapon, (4) whether the weapon is stolen, (5) whether possession is legitimate or illegal, (6) whether the firearm is loaded, (7) proximity to drugs or drug profits, and (8) the circumstances under which the gun is found. *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004).

Here too, the evidence was sufficient to support the jury's finding not only that Carey possessed the firearm but also that his possession was in furtherance of drug trafficking. Regarding possession, the jury heard evidence that the firearm was

---

[3] The evidence with respect to the conspiracy charge is even stronger because, as the government points out, conspiracy is a continuing offense and a defendant is responsible for the full amount of drugs that passes through the conspiracy. *See United States v. Clark*, No. 19-CR-015, 2020 WL 5269625, at *5 (E.D.Pa. Sept. 3, 2020).

paid for by Carey and found inside Carey's residence on top of his bed and in close proximity to drugs and drug trafficking materials. The firearm was found loaded, and Slone, the only other individual in the residence, testified that she did not know how to load the gun or even its make or model. In addition, police recovered from the residence a holster for the firearm, and Slone testified that the holster was not hers. The jury heard testimony that the gun was always out inside the residence and kept on the nightstand beside Carey at night. Given these considerations, it was reasonable for the jury to find that Carey constructively possessed the firearm.

Further, application of the *Sparrow* factors confirm that the government proved beyond a reasonable doubt that the firearm was possessed in furtherance of drug trafficking. The jury heard testimony that Carey trafficked in cocaine and marijuana and that the firearm was readily accessible to Carey. The type of weapon was a small firearm that was not difficult to conceal, and while the gun was not stolen, Carey's possession of it was illegal. The gun was found loaded and in close proximity to drugs and in the same residence Carey had just left carrying approximately 80,000 in drug money. Considering these factors, a reasonable jury could have found that Carey possessed the gun for the purpose of advancing his drug distribution activities. As such, the jury's determination that Carey possessed the firearm in furtherance of drug trafficking was supported by sufficient evidence.

**d. The jury heard sufficient evidence from which it could conclude beyond a reasonable doubt that Carey entered into a conspiracy to possess with the intent to distribute cocaine and marijuana.**

Carey's motions additionally argue that Carey should be acquitted on Count IV because the government failed to prove that he entered into a conspiracy with Slone to possess with intent to distribute cocaine and marijuana. According to Carey, the evidence showed only that he was dating Slone, not that he entered into an agreement to distribute or possess with intent to distribute marijuana and cocaine. Carey's arguments are unconvincing.

"To make out a conspiracy charge, the Government must show: (1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal." *United States v. Pressler*, 256 F.3d 144, 147 (3d Cir. 2001).

At trial, the jury was presented with recorded telephone calls between Carey and Slone from April 6-8, 2018 in which they discussed the quantity of drugs inside Carey's residence, referenced prior conversations regarding the destruction of drug-related evidence, and made plans for collecting outstanding drug debts. In addition, Slone testified that she accompanied Carey to Lancaster with a firearm to purchase cocaine, created an owe sheet at Carey's direction to keep track of the debts that were owed from drug distribution, and made successful efforts to collect such debts. This evidence, together with the substantial quantities of cocaine and marijuana and

drug trafficking paraphernalia found inside the residence, was sufficient to show that Carey and Slone had shared unity of purpose to distribute cocaine and marijuana and that they intentionally entered into an agreement in furtherance of that objective. Accordingly, the evidence was sufficient to find that Carey entered into a conspiracy to possess with the intent to distribute cocaine and marijuana.

### e. The government did not present misleading or improper arguments as to the quantity of cocaine alleged in Count I.

Carey's motions also claim that the government presented misleading arguments to the jury as to whether the evidence on Count I proved that Carey possessed with intent to distribute 500 grams of cocaine. Specifically, the defense avers that the government misled the jury at closing by presenting a PowerPoint slide "indicating two uses of the 'kilo' press [would] reach 500 grams." It further contends that the government improperly argued to the jury that its proofs satisfied the 500-gram threshold aggregating undated drug-distribution entries found on the owe sheet.

Despite Carey's arguments, the government's closing statements regarding the kilo press and owe sheet were not improper or misleading. The government did not expressly argue that the jury could or should find that Carey possessed over 500 grams of cocaine by imagining two hypothetical uses of the kilo press. (*See* Doc. 254 at 33:9-17.) Its argument that two uses of the kilo press would exceed 500 grams was rather made during a lengthy passage underscoring that the evidence pointed to

a large-scale trafficking operation. (*See e.g.*, Doc. 32 at 12:16, 33:3-8.) Similarly, with respect to the owe sheet, the government argued to the jury that the document's entries reflecting large outstanding debts indicated that Carey was "fronting" cocaine to others for distribution. (*See* Doc. 254 at 29:12-20, 33:9-17.) The government neither argued nor even suggested that the jury should aggregate the distributions reflected on the owe sheet to find that Carey possessed the requisite quantity of cocaine. Notably, following its discussion of the kilo press and owe sheet, the government proceeded to argue that the 500-gram threshold was established by entirely different evidence (*id*. at 33:18-35:9), and it indeed clarified to the jury that the charge required it prove that possession took place during one single occurrence (*id*. at 35:17-18). Moreover, the court instructed the jury that lawyers' statements and arguments are not evidence and that it could only find possession of 500 grams or more if the possession occurred at one time (*Id.* at 68:6-8, 80:5-12), and the court presumes it followed those instructions. *See Weeks v. Angelone,* 528 U.S. 225, 234 (2000). A new trial is therefore inappropriate.[4]

---

[4] Carey also claims that the government continuously displayed the marijuana and cocaine evidence throughout the course of trial, which caused him prejudice "because of the potential impact on the jurors who were seated throughout the rear of the courtroom and not limited to the jury box" due to COVID-19 precautions. This is incorrect. The cocaine and marijuana were not put on display for the jury to observe throughout the course of the entire trial. Following their admission into evidence, the drugs were shown at several points throughout the proceeding, without any objection by the defense, because they were used in the course of questioning several witnesses. (*See* Doc. 258 at 28:9-20, 108:19-111:11, 112:17-116:6, 120:20-122:24; Doc. 257 at 124:17-126:4). Their display was not improper or prejudicial.

### f. Carey has not shown a prejudicial variance between the indictment and the evidence adduced at trial.

Carey's motions additionally contend that a new trial is required because there was an impermissible variance between the charges in the indictment and the evidence adduced at trial.[5] A variance occurs "where the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Daraio*, 445 F.3d 253, 261 (3d Cir. 2006) (quoting *United States v. Castro,* 776 F.2d 1118, 1121 (3d Cir.1985)). In the event of a variance, relief will be ordered only if the defendant shows that it prejudiced a substantial right. *Id.* "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." *United States v. Schoenhut,* 576 F.2d 1010, 1021-22 (3d Cir.1978).

Here, Carey has not shown a variance that prejudiced his substantial rights. The indictment charged Carey with drug trafficking and firearm crimes that occurred

---

[5] Carey's motion blurs the line between constructive amendment and variance, but the substance of his argument is that there was a time variance between the charges outlined in the indictment and the evidence adduced at trial, not a modification of the elements of the crimes charged. As such, any claim that the indictment was constructively amended based on a time variance fails. *See United States v. Somers*, 496 F.2d 723, 728 (3d Cir. 1974).

on or around April 6, 2018, and the government put on sufficient evidence that Carey committed those crimes in reasonable proximity to that date. *See Daraio*, 445 F.3d at 263 (declining to find a prejudicial variance based on "substantial reference at trial to conduct not within the scope of the indictment" in part because "the government proved the material facts of the indictment at the trial"). While the government did elicit some testimony regarding criminal activity from outside the indictment period, such as that Carey cooked and possessed cocaine sometime between September-November 2017, the jury was instructed regarding the government's burden to prove that the offenses were committed on or within a reasonable period of April 6, 2018, and its verdicts were supported by sufficient evidence. (Doc. 254 at 79:10-15.)

In addition, to the extent a variance did occur, Carey has not shown that it prejudiced his substantial rights. Carey does not contend that any variance would cause him double jeopardy issues, and the record reflects that the government provided its evidence to the defense in advance of trial. *See United States v. Miller*, 527 F.3d 54, 70 (3d Cir. 2008) (finding that a variance did not prejudice the defendant's substantial rights where he was aware of the government's evidence against him); *Somers*, 496 F.2d at 746 (finding that a timing variance did not result in prejudice where defense counsel had an adequate opportunity to address the evidence). The defense's only substantive argument that Carey was surprised by the evidence stresses that the government produced notes from a meeting with Slone

just a few days before trial, but it goes no further than that and does not explain any

actual reason for surprise. Moreover, the meeting notes were produced shortly before

trial because the government met with Slone for trial preparation just a few days

before that, and long after she sat for a proffer interview, the records of which Carey

already possessed. (*See* Doc. 258 at 189:2-4, 191:25-192:17; Doc. 257 at 22:11-25,

25:21-25.) As such, no prejudicial time variance occurred and a new trial is not

warranted.[6]

## IV.   **CONCLUSION**

For the reasons outlined above, Defendant Damon Todd Carey's motions for

acquittal and new trial will be denied. An appropriate order shall follow.

*s/Sylvia H. Rambo*
SYLVIA H. RAMBO
United States District Judge

Dated: September 29, 2021

---

[6] Carey's motion for new trial also avers that Count III of the indictment alleging violation of 18 U.S.C. § 924 (c) was constructively amended because the government requested at trial that the jury be instructed on Pinkerton liability, which the court granted without objection. This argument is not persuasive, since a constructive amendment occurs only where the evidence and jury instructions modify essential terms of the substantive offense, and *Pinkerton* liability is merely a theory "under which the government may prove a substantive criminal offense." *United States v. Whitted*, 734 F. App'x 90, 95 (3d Cir. 2018) ("[I]ndictments do not recite the government's theory of proof, which is what the *Pinkerton* theory is. The function of a federal indictment is to state concisely the essential facts constituting the offense, not how the government plans to go about proving them") (internal citations and quotation marks omitted); see also *United States v. Ashley*, 606 F.3d 135, 142-43 (4th Cir. 2010) (collecting cases and finding that "a district court does not constructively amend an indictment by giving a Pinkerton instruction when Pinkerton liability has not been charged by the grand jury. This has been the unanimous view of the circuit courts which have addressed this issue.").